## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

JANICE M. VAN MATRE,      )
                                 )
      Plaintiff,         )
                                 )
  vs.                    )    **Case number 1:09cv0139 TCM**
                                 )
MICHAEL J. ASTRUE,       )
Commissioner of Social Security,  )
                                 )
      Defendant.     )

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Janice Van Matre's application for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, is before the Court for a final disposition.[1] Ms. Van Matre has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Janice Van Matre (Plaintiff) applied for DIB in March 2004 and, after an administrative hearing, was found to be disabled from June 10, 2003, through July 21, 2004. See Van Matre v. Astrue, No. 1:06cv0133 MLM, slip op. at 2 (E.D. Mo. July 9, 2007). She was further found not to be disabled after that date. Id. The Appeals Council denied her request for review of the August 2005 decision of the Administrative Law Judge (ALJ),

---

[1] See 28 U.S.C. § 636(c).

effectively adopting that decision as the Commissioner's final decision.  Id.  Plaintiff sought

judicial review.  Id.  The decision of the Commissioner was affirmed.  Id., slip op. at 24.

Plaintiff did not appeal.

In December 2006, Plaintiff applied again for DIB, alleging a disability since August

1, 2004, caused by obesity, carpal tunnel in both wrists, and arthritis in her back, neck, and

hip.  (R.[2] at 97-99.)  This application was denied on initial review and after an

administrative hearing held in August 2008 before ALJ James B. Griffith.  (Id. at 6-54, 68-

73.)  The Appeals Council denied her request for review.  (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Susan Shay, a vocational expert (VE), testified

at the administrative hearing.  Plaintiff's husband also testified.

Plaintiff testified that she was then 51 years old, married, and living with her

husband and their two children, ages nineteen and seventeen.  (Id. at 28-29.)  She had

finished high school and had one year of vocational training in drafting.  (Id. at 29.)  She

has a driver's license and drove to the hearing.  (Id.)  Once or twice a week, she drives

around the block to visit her mother; once a week or every other week she drives to Cape

Girardeau for a doctor's appointment.  (Id. at 30.)

She last worked part-time, i.e., eight hours a week, out of her house writing stories

for a local newspaper.  (Id.)  Her last full-time job was in July 2002 and was as an

--------

[2]References to "R." are to the administrative record filed by the Commissioner with his
answer.

administrative assistant at a naval base in Virginia.  (<u>Id.</u> at 30, 31.)  The job ended because her husband was retiring from the Navy and they were relocating to Missouri.  (<u>Id.</u> at 32.)  Also, she had been having problems with her back "off and on for years."  (<u>Id.</u>)

Her alleged disability onset date was suggested by the Social Security office.  (<u>Id.</u> at 30-31.)  Her health has never improved.  (<u>Id.</u> at 31.)  She has a lot of pain in her lower back, neck, and left hip and knee.  (<u>Id.</u> at 32-33.)  She also has heart problems and had to have a stent placed.  (<u>Id.</u> at 33-34.)  She had back surgery in August 2003.  (<u>Id.</u> at 34.)

Because of the problems with her back, she cannot sit, stand, or walk for "any amount of time."  (<u>Id.</u> at 35.)  Now, she can walk no farther than fifty feet without needing an assistive device.  (<u>Id.</u> at 36.)

Plaintiff testified that her left knee began bothering her in the summer of 2004.  (<u>Id.</u>)  She also has carpal tunnel syndrome in both wrists.  (<u>Id.</u>)  The problems with her back have never resolved.  (<u>Id.</u> at 38.)  She has a lot of pain and a loss of flexibility.  (<u>Id.</u>)  The pain varies between a six and an eight.  (<u>Id.</u> at 39.)  She had a spinal injection, which did not help, and was going to try another procedure later that month.  (<u>Id.</u>)

When at the hearing, Plaintiff was wearing a heart monitor.  (<u>Id.</u> at 37.)  It had been put on her the day before and was to be removed that day.  (<u>Id.</u>)  She takes nitroglycerin occasionally.  (<u>Id.</u>)

Plaintiff's husband does most of the grocery shopping.  (<u>Id.</u> at 41.)  If she does it, she has to lie down for a few hours after returning from the store. (<u>Id.</u> at 42.)  She does not attend any school functions because it hurts to sit on the bleachers.  (<u>Id.</u>)  She does not have

any social life.  (Id.)  On a typical day, she gets up, takes some medicine, eats something, takes her heart medicine, drinks tea, looks at the mail, checks her email, and lies down.  (Id. at 43.)  Her children do all the housework.  (Id.)

Plaintiff smokes a pack of cigarettes a day.  (Id. at 44.)  She drinks thirty to thirty-five beers a week.  (Id.)

Mr. Van Matre testified that Plaintiff has difficulty standing on her feet for any length of time.  (Id. at 45.)  Consequently, she cannot cook like she used to or do much housework.  (Id.)  She has difficulty climbing stairs and has to use a handrail in the bathroom.  (Id. at 45-46.)  She has been this way "pretty much" since he retired in 2002.  (Id. at 46.)  He does the majority of the housework, the yard work, and the shopping.  (Id.)  His children help.  (Id.)

Susan Shay testified as a VE.  She testified that Plaintiff's past relevant work as an administrative assistant could be performed by someone with the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently and to stand, sit, or walk for up to approximately six hours in an eight-hour day with normal breaks.  (Id. at 48-49.)

At the conclusion of the testimony, Plaintiff's counsel asked that the earlier case be reopened and a favorable decision be granted in that case also.  (Id. at 52.)  Asked for the basis of his request, he explained that Plaintiff had credibly testified that her condition was severe and disabling then.  (Id. at 53.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and an assessment of her physical and mental residual functional capacities.

When applying for DIB, Plaintiff completed a Disability Report, listing her height as 5 feet 4 inches and her weight as 268 pounds.  (<u>Id.</u> at 128-38.)  Her ability to work is limited by carpal tunnel in both wrists, obesity, and arthritis in her back, neck, and left hip.  (<u>Id.</u> at 129.)  These impairments are limiting because of pain, stiffness, difficulty bending and squatting, muscle spasms, and numbness and tingling in her legs and fingers.  (<u>Id.</u>)  They first started to interfere with her ability to work in the 1980s and stopped her from working on August 1, 2004.  (<u>Id.</u>)  She actually stopped working on July 20, 2003, because of her medical condition.[3]  (<u>Id.</u>)  She currently takes fifteen medications, including some over-the-counter medications.  (<u>Id.</u> at 135.)  Three cause sleepiness; one causes diarrhea.  (<u>Id.</u>)  She drinks alcohol at night instead of taking pain medication because it helps her sleep better and think better in the morning.  (<u>Id.</u> at 138.)

Plaintiff also completed a Function Report.  (<u>Id.</u> at 139-46.)  The most activity she does during the day is to rinse breakfast dishes, let the dog in and out, and cook an easy meal.  (<u>Id.</u> at 139.)  Otherwise, she does such sedentary activities as watching television, downloading and reading one or two emails, and calling her mother.  (<u>Id.</u>)  Because of her

---

[3]This seeming discrepancy is not explained.

medication and stress, she has diarrhea an average of five times a day.  (Id.)  Pain in her lower back and hips and numbness and pain in her wrists cause her to wake up during the night.  (Id. at 140.)  She can no longer take a bath due to problems caused by her weight and stiffness.  (Id.)  She prepares breakfast and dinner twice a week, and has to take breaks when doing so.  (Id. at 141.)  She does laundry with help from her family.  (Id.)  When doing the laundry or dishes, she has to sit on  a stool and brace herself against a wall.  (Id.)  Her husband and children help her.  (Id.)  She goes outside during the spring and fall for approximately ten minutes twice a day.  (Id. at 142.)  It is too hot or cold to do so during the summer and winter.  (Id.)  She shops for groceries and other household items twice a week for fifteen to twenty minutes.  (Id.)  She shops for a greater variety of things every ten days for thirty to sixty minutes.  (Id.)  She cannot sit for longer than fifteen to twenty minutes without a significant increase in back pain.  (Id. at 143.)  Her impairments affect her abilities to lift, squat, bend, stand, walk, sit, kneel, climb stairs, complete tasks, and concentrate.  (Id. at 144.)  She can not walk farther than fifty feet without having to stop and rest for five to fifteen minutes.  (Id.)  She can pay attention as long as required unless she is in pain.  (Id.)  She follows written and spoken instructions well.  (Id.)  She gets along well with authority figures, but does not handle stress well.  (Id. at 145.)  She does not like changes in routine.  (Id.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of her application.  (Id. at 154-61.)  Beginning in January 2007, she has also has problems with depression, irritability, indecisiveness, and procrastination.  (Id. at 155.)

The relevant medical records before the ALJ are summarized below in chronological order.

In June 2003, Plaintiff consulted H.L. Schneider, Jr., D.O., with Gastroenterology Associates of Southeast Missouri (Gastroenterology Associates), reporting a several-year history of gastroesophageal reflux disease (GERD), a recent weight gain, and occasional episodes of vomiting. (Id. at 329-30.) The diagnosis was GERD and possible irritable bowel syndrome. (Id. at 330.)

In August 2003, David G. Yingling, M.D., performed a segmental decompression at L3-L4 and L4-L5 with a right L4-L5 discectomy. (Id. at 227-38.)

In May 2004, Dr. Yingling saw Plaintiff on a follow-up visit for her complaints of continuing back pain. (Id. at 170.) He recommended a lumbar epidural injection for the pain. (Id.) He also noted that records from Dr. David Lee indicated carpal tunnel syndrome, greater on the right than on the left, and that Plaintiff wanted to wait until after the summer to have the carpal tunnel surgery. (Id.) Subsequently, Plaintiff had a lumbar epidural injection in June and again in July. (Id. at 192-93, 198-99.) After the first injection, she reported experiencing less pain between her hips when sleeping and less shooting pain into her lower extremities. (Id. at 192.)

Also in June, Plaintiff had x-rays of her knees; both were normal. (Id. at 247-48.)

Plaintiff saw Dr. Schneider in August and in September. (Id. at 328, 335-37, 342.) She was continued on Elavil and told to decrease her Aciphex (for GERD) to once a day. (Id. at 328.) She was to return as needed. (Id.)

In April 2005, Plaintiff saw David A. Law, M.D., and underwent a stress test and myocardial perfusion scan.  (<u>Id.</u> at 206-08, 578-79.)  The former was negative; the latter was negative with the exception of "some evidence of mild anterior and inferior attenuation artifact."  (<u>Id.</u> at 206-08.)  Dr. Law noted Plaintiff's reports of occasional chest tightness and shortness of breath.  (<u>Id.</u> at 206, 578.)  She had put on weight during the last few months (she currently weighed 243 pounds), had back problems, and did not do a lot of exercise.  (<u>Id.</u>)  She smoked one pack of cigarettes a day and drank eight to ten beers a day.  (<u>Id.</u>)  She was encouraged to stop smoking and drinking.  (<u>Id.</u>)

Plaintiff saw Wendi M. Carns, M.D., in June for her annual gynecological examination.  (<u>Id.</u> at 181-82, 184-87.)  Her primary complaints were of depression and fatigue.  (<u>Id.</u> at 182.)  She did not want any treatment for the former.  (<u>Id.</u> at 181.)  She also complained of urinary incontinence with running, jumping, or quick movements.  (<u>Id.</u> at 182.)  She was encouraged to stop smoking.  (<u>Id.</u> at 181.)

The following month, she complained to a nurse at Crosstrails Medical Center (Crosstrails) of sinus congestion and chronic depression.  (<u>Id.</u> at 283-84.)  Plaintiff complained again of depression at her July and three August visits.  (<u>Id.</u> at 277-82.)  She was continuing to drink six to eight beers a night and had not sought counseling as recommended.  On September 12, she was again encouraged to seek counseling for her family and drinking issues.  (<u>Id.</u> at 275-76.)  Two weeks later, Plaintiff was described by a Crosstrails nurse as looking better and drinking much less.  (<u>Id.</u> at 273.)  She could go two to three days without drinking beer.  (<u>Id.</u> at 273.)  Her weight was 241 pounds.  (<u>Id.</u>)  She

was trying to diet and improve her attitude.  (Id.)  The diagnosis was anxiety, depression, and obesity.  (Id. at 274.)  Her prescription for Zoloft was continued.  (Id.)  She was to return in two weeks for a check-up on her weight.  (Id.)

Dr. Law opined at Plaintiff's follow-up visit in October that her chest pain was not coronary artery disease.  (Id. at 255, 576-77.)

Plaintiff reported to Dr. Law in February 2006 that she was having sporadic chest pain, had been taking nitroglycerin "every once in a while," and felt more short of breath than she should although she had put on a lot of weight.  (Id. at 254, 574-75.)  She weighed 258 pounds.  (Id. at 254, 574.)  After she had a stress echo test, an electrocardiogram (EKG), and a resting echocardiogram, he thought her atypical pain might be related to the stress she was under due to trouble she was having with her daughter.  (Id.)

On June 6, Plaintiff saw Dr. Carns for her annual gynecological examination.  (Id. at 179-80, 183.)  She weighed 266 pounds.  (Id.)  She was smoking, drinking a six-pack of beer a day, and concerned about her fatigue and weight gain of twenty pounds the previous year.  (Id. at 179.)  She was frustrated with the limitations caused by her osteoarthritis.  (Id.)  She wanted something to increase her metabolism.  (Id.)  She was not exercising because of her arthritis and reported that she was not following "a very good diet."  (Id.)  Dr. Carns suspected that she was depressed; however, Plaintiff denied being so and declined any anti-depressant medication.  (Id.)  She was encouraged to stop smoking and drinking.  (Id.)

Plaintiff complained to the Crosstrails physicians on July 25 of neck pain for the past four days. (Id. at 269-70.) She had been using the computer more. (Id. at 269.) She had a negative Spurling's sign.[4] (Id. at 270.)

On August 18, Plaintiff had a magnetic resonance imaging (MRI) of her cervical spine. (Id. at 251, 344.) There was mild left foraminal stenosis at C3-C4 and at C4-C5, a mild bulging annulus at C4-C5, a broad based right posterolateral disc protrusion abutting but not compressing the cord at C5-C6, a mild right foraminal stenosis at C5-C6, and a mild bilateral foraminal stenosis and small central and right paracentral disc protrusion at C6-C7. (Id.)

A few days later, Plaintiff saw Dr. Law. (Id. at 253, 422, 445-48, 570-73.) A carotid Doppler exam revealed "trivial carotid disease in the range of 1-15% bilaterally." (Id. at 253, 422, 445, 570.) He thought she was "doing very well from the cardiac standpoint." (Id.) She weighed 268 pounds. (Id.)

In September, Plaintiff saw David C. Boardman, D.O., to establish a primary care physician relationship, to discuss her MRI results, and to get a refill of her medications. (Id. at 258-59.) She complained of neck pain for six to eight weeks and of occasional tingling in her right hand. (Id. at 258.) She had a full range of motion in her neck, although it was mildly painful. (Id.) She also had normal motor and sensory function. (Id.) The

---

[4]"Spurling's sign is performed by the patient extending her neck and rotating her head toward the side of their pain. The test is positive if pain is exacerbated by this position." Medscape Today, The Evaluation of Patients with Neck Pain: Physical Examination, http://www. medscape.com/ viewarticle/408540_4 (last visited Mar. 22, 2011).

assessment was neck pain; the course of action was for Plaintiff to let Dr. Boardman know when she wanted a referral. (Id. at 258-59.) She was to follow-up in three months or sooner if her symptoms worsened. (Id. at 259.)

On October 5, November 16, November 22, and November 30, Plaintiff consulted the physicians at Crosstrails about a cough. (Id. at 261-68.) It was thought she might have bronchitis. (Id. at 262, 264, 267.)

Plaintiff returned to the health care practitioners at Crosstrails in February 2007 to discuss her medications and her arthritic conditions and limitations. (Id. at 391-92.) She had no new problems or concerns and was in no acute distress. (Id. at 391.)

In April, she saw Dr. Law, reporting occasional chest pain and no need for nitroglycerin for "quite some time." (Id. at 421, 442-44, 567-69.) Her primary complaint was her increasing weight, currently at 268 pounds. (Id. at 421, 443, 568.) He was concerned about her anticipated use of Phentermine, an appetite suppressant similar to an amphetamine,[5] given her documented coronary artery disease and requested that she wait to begin using it until she had a cardiac stress evaluation. (Id.) Her EKG was normal. (Id.)

In May, she returned to Crosstrails with concerns about her back pain and obesity, which was described as a modifying factor of her back pain. (Id. at 417-18.) Her weight was 275 pounds. (Id. at 417.)

_____

[5]See Drugs.com, http://www.drugs.com/search.php?searchterm=phentermine (last visited Mar. 22, 2011).

Plaintiff returned to Gastroenterology Associates in September and was seen by a nurse practitioner.  (Id. at 325-27, 331-34, 338-40.)  She reported that medication usually controlled her heartburn and reflux.  (Id. at 325.)  If she overate or ate certain rich foods, which she did usually two times a week, she would have symptoms.  (Id.)  When under stress or when overeating, she would have episodes of vomiting.  (Id.)  Four days ago, she had had an episode of vomiting.  (Id.)  She had increased gas and bloating.  (Id.)  She tried to eat small frequent meals.  (Id.)  Each day, she drank six to ten beers each day, smoked one to one and a-half packs of cigarettes, and drank three quarts of a caffeinated beverage.  (Id. at 326.)  She had back pain, chest pain, and occasional irregular heartbeats.  (Id.)  She was stiff in her joints in the morning.  (Id.)  She weighed 283 pounds.  (Id.)  She had a full range of motion and even, unlabored respiration.  (Id.)  She was alert and oriented times three, very pleasant, and cooperative.  (Id.)  The diagnoses were rectal bleeding, GERD, and "[p]revious diagnosis of cyclic vomiting."  (Id.)  She was continued on her current GERD medication, was to undergo a colonoscopy and have lab work done, and was encouraged to drink less beer.  (Id. at 327.)  The colonoscopy revealed colonic polyps.  (Id. at 324.)  The upper endoscopy revealed GERD and gastritis.  (Id. at 332.)

That same month, she saw Dr. Law.  (Id. at 423, 438, 563.)  She had atypical chest pain and shortness of breath.  (Id.)  She was to have a cardiac stress evaluation that day.  (Id.)  That evaluation showed no evidence of myocardial ischemia or scar.  (Id. at 439-41, 564-66.)  She was able to exercise for only three minutes.  (Id. at 439, 564.)  Dr. Law

opined that it was unlikely that Plaintiff's chest pain was cardiac in etiology and encouraged aggressive risk factor modification and weight loss. (Id. at 440, 565.)

Following sleep studies on January 4, 2008, and on February 4, Plaintiff was diagnosed with mild obstructive sleep apnea. (Id. at 365-66, 402-03, 419-20, 424, 434-35, 507-17, 526-34, 539-46.) The physician, William K. Graham, M.D., recommended that she avoid alcohol, continue to try to lose weight, avoid supine sleep, and titrate her bilevel positive airway pressure (Bi-PAP) at 15/7. (Id. at 366.) Three weeks later, Plaintiff was instructed on how to use a Bi-PAP machine. (Id. at 370.)

A chest x-ray taken on January 24 was normal. (Id. at 345, 432-33.)

After an almost-four year absence, Plaintiff returned to Dr. Yingling on February 26 for a re-evaluation of her carpal tunnel release and an evaluation of her back and hip pain. (Id. at 560-61.) On examination, she was in no acute distress, awake, alert, and oriented. (Id. at 560.) She had good strength in all four extremities, diminished sensation to pinprick in the lateral three and one-half digits of her right hand, a positive Tinel's sign at the right wrist,[6] tenderness to palpation at the lumbosacral area, bilateral trochanteric tenderness, and a mildly positive straight leg raising on the left. (Id.) Dr. Yingling concluded Plaintiff had stenosis at L3-L4 with severe facet arthropathy, bilateral trochanteric bursitis, and symptomatic right carpal tunnel syndrome. (Id.) He informed her that, if she was to have surgery on her back, she would need to have recurrent decompression at L3-L4 and

_____

[6]A Tinel's sign is "a tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb." Merriam-Webster, Tinel's Sign, http://www.merriam-webster.com/medical/tinel's%20sign (last visited Mar. 22, 2011).

posterior lumbar interbody fusion. (Id. at 560-61.) She was not ready to do so. She was ready to have right carpal tunnel release, bilateral facet joint injections, and bilateral trochanteric bursa injections. (Id. at 561.) She was to have the injections at the Saint Francis Medical Center Pain Clinic. (Id.)

Plaintiff first consulted Jimmy Bowen, M.D., on March 13 for her complaints of pain in her left knee, both hips, and lower back. (Id. at 346-48.) Her back pain was worse when she was on her feet. (Id. at 346.) She occasionally was numb in her legs and her left foot sometimes dropped when she has been on her feet. (Id.) Her left hip hurt when she rotated and she was frequently limp because of the left knee pain. (Id.) She had a history of chest pain but had none currently. (Id.) She had difficulty breathing. (Id.) Her weight was 290 pounds. (Id.) On examination, Plaintiff could forward flex to 60 degrees with end range pain and to 70 degrees with pain radiating into her left side. (Id. at 347.) With left side bend, left rotation, and left extension, she had pain that radiated to her left buttocks. (Id.) She had bilateral hip abductor area tenderness to palpation. (Id.) She had some pain with external rotation of her left hip to 60 degrees and with internal rotation to 25 degrees. (Id.) She had negative straight leg raises.[7] (Id.) The strength in her lower extremities was 5/5. (Id.) Her deep tendon reflexes were 0/4 at her knees, 1/4 at her medial hamstrings, 0/4 at her left Achilles, and 1/4 at her right Achilles. (Id.) She was very tender on palpation at

---

[7]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

her left knee.  (Id.)  An MRI[8] of her left knee showed small knee effusion, a tiny Baker's cyst, a small amount of subcutaneous swelling in the anterior knee without localized bursitis, an area of thinning and abnormal signal within the patellar cartilage, and a subcorticle cyst in the inferior margin lateral facet adjacent to deep fissure.  (Id. at 346, 428-29, 452-53.)  There was a suggestion of some mild chondromalacia.  (Id.)  An MRI of her hips showed only a moderate increased T2 signal in the soft tissue adjacent to her left trochanteric area, swelling in her gluteus medius and minimus, increased intensity of the soft tissue in the right hip adjacent to the right greater trochanteric bursa, and a six millimeter benign appearing cyst on the right iliac wing.  (Id. at 346, 425-27, 454-56.)  The MRI of her lumbar spine showed mild lumbar spondylosis, multi-level facet arthropathy most marked at L3-L4, multi-level disc disease, minimal anterior listhesis of L3 on L4, marked central stenosis at L3-L4, multi-level foraminal stenosis, and prior L4-L5 partial decompression laminectomies and partial discectomy.  (Id. at 346, 430-31, 457-59.)  Ten minutes after being injected in her left knee with a pain medication, she reported having almost 100% relief and was able to squat down and come back up using the weight on that leg, something she had not been able to do for three to four years.  (Id. at 348.)  She also had a nonantalgic gait.  (Id.)  She was to return in two weeks.  (Id.)  Dr. Bowen noted that at least one-half of his time spent with Plaintiff was in counseling her.  (Id.)

Four days later, Plaintiff had bilateral L3-L4 facet joint injections administered by Andrew F. Walker, M.D., of the Saint Francis Medical Center Pain Clinic.  (Id. at 478-91.)

---

[8]The MRIs had been taken the previous January.

Plaintiff cancelled the next appointment with Dr. Bowen, reporting that she had had hip injections at the pain clinic the previous week and that her left knee continued to feel good. (Id. at 349.) She was sleeping at night and any pain she felt was tolerable. (Id.)

In April, Plaintiff reported to Dr. Walker that the facet joint injections had given her 30% relief of her symptoms for one week. (Id. at 465-69.) Her hips had also felt better after the trochanteric injections. (Id. at 466.) She had developed some muscle spasms and was to be tried on muscle relaxers for a few weeks. (Id.) If that failed, she would consider whether to pursue a different remedy. (Id.)

In May, it was discovered that Plaintiff's Bi-PAP machine was leaking and was set too high. (Id. at 397-401.) Both problems were remedied. (Id. at 397.)

Plaintiff returned to Dr. Bowen in June. (Id. at 350.) She reported that she had had relief from the injection in her left knee for four to six weeks and then the pain had returned. (Id.) On examination, she walked with a nonantalgic gait and could easily forward flex, extend, extend and rotate, and side bend with minimal pain. (Id.) She was tender to palpation on her left hip. (Id.) She had a good range of motion of her left knee and no pain with internal or external rotation of her hip. (Id.) Dr. Bowen recommended Celebrex, gave her samples, and told her to return if the medication did not work. (Id.) Again, at least half his time with Plaintiff was spent counseling her. (Id.)

Two weeks later, Plaintiff telephoned, reporting that the Celebrex was not helpful. (Id. at 351.) Consequently, she saw Dr. Bowen on July 16 and had another injection. (Id. at 352.) She was also given a prescription for Ultram. (Id.) She was to return in three

weeks.  (Id.)  Dr. Bowen signed an application for Plaintiff for a disabled license plate or placecard on the basis of a temporary disability lasting between 161 and 180 days.  (Id. at 343.)

On July 29, Plaintiff reported to Dr. Walker that she had had fewer symptoms for three to four weeks after her March injections and that her low back pain was currently a seven a ten-point scale.  (Id. at 492-99, 601-08.)  He thought she would be a good candidate for radiofrequency facet ablation[9] and "possibly even X-STOP."[10]  (Id. at 496, 605.)  She agreed to the former.  (Id. at 497, 606.)

Also in July, Plaintiff twice consulted a nurse at Crosstrails about a cough.  (Id. at 384-87.)  At the second visit, she reported having abdominal pain.  (Id. at 384.)  Her weight was 273 pounds.  (Id.)

Plaintiff underwent a bilateral L3-L4 facet radiofrequency ablation in August.  (Id. at 585-600.)

Plaintiff saw Dr. Law on August 12.  (Id. at 562.)  No symptoms were recorded in her symptom diary.  (Id.)  The readings from a Holter monitor showed premature ventricular

---

[9]"Radiofrequency ablation (or RFA) is a procedure used to reduce pain. An electrical current produced by a radio wave is used to heat up a small area of nerve tissue, thereby decreasing pain signals from that specific area."  Pain Management Health Center, Radiofrequency Ablation for Arthritis Pain, http://www.webmd.com/pain-management/radiofrequency-ablation (last visited Mar. 22, 2011).

[10]In X-STOP surgery, "a titanium implant is inserted into the back at the lumbar spine segment that has symptomatic spinal stenosis" "to prevent a patient from bending too far backward at the narrowed segment . . . ."  Jack Zigler, M.D. Spinal Stenosis Surgery:  The X-STOP, http://www.spine-health.com/conditions/spinal-stenosis/spinal-stenosis-surgery-x-stop (last visited Mar. 24, 2011).  It is described as "a minimally invasive surgical procedure."  Id.

contractions, but no ventricular tachycardia, and rare premature atrial contractions, but no supraventricular tachycardia.  (Id.)

The ALJ also had before him the reports of assessments by non-examining consultants.

In February 2007, James Spence, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 308–18.)  Plaintiff was described as having an affective disorder, i.e., depression, and an anxiety-related disorder, i.e., anxiety, that were not severe.  (Id. at 308, 311, 312.)  Her two disorders resulted in mild restrictions of activities of daily living, in no difficulties in maintaining social functioning, and in no difficulties in maintaining concentration, persistence, or pace.  (Id. at 316.)  Nor were there any episodes of decompensation of extended duration.  (Id.)

That same month, a Physical Residual Functional Capacity Assessment (PRFCA) was completed by a non-medical consultant as part of the application review process.  (Id. at 319-24.)  The primary diagnoses were degenerative disc disease of the lumbar and cervical spines and status-post lumbar discectomy.  (Id. at 319.)  These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry twenty pounds; frequently lift or carry ten pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id. at 320.)  Her ability to push or pull was unlimited other than these lifting and carrying restrictions.  (Id.)  She had no postural, manipulative, visual, communicative, or environmental limitations.  (Id. at 321-23.)

**The ALJ's Decision**

Analyzing Plaintiff's application under the Commissioner's five step evaluation process, see pages 21 to 23, below, the ALJ first found that Plaintiff met the insured status requirements through June 30, 2009, and had not been engaged in substantial gainful activity since August 1, 2004.  (Id. at 11.)  The ALJ next found that Plaintiff had severe impairments of bursitis, obesity, tobacco abuse, degenerative disc disease, degenerative joint disease, and alcohol abuse.  (Id.)  Her impairments of sleep apnea, heart disease, carpal tunnel syndrome, and GERD were not severe.  (Id.)  In support of these findings, he summarized the medical records, including the results from the pain clinic, Plaintiff's complaints to Dr. Carns, the various MRI findings, the records from Crosstrails, and the reports of Drs. Yingling, Law, Schneider, and Bowen.  (Id. at 13-16.)  The ALJ concluded that Plaintiff's severe impairments did not, singly or in combination, meet or equal an impairment of listing-level severity.  (Id. at 16.)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that she had the RFC to perform the full range of sedentary work.[11]  (Id. at 16.)  In reaching this determination, the ALJ considered the credibility of Plaintiff's statements.  (Id. at 16-21.)  He compared those statements with the objective evidence, e.g., the Dr. Yingling's general characterization of his findings as mild; her primary care physician's treatment notes indicating only occasional complaints of pain; her description to Dr. Carns of such activities as jumping, running, and moving quickly and no report of ongoing back

---

[11]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

pain; the general observations that she was in no acute distress; and the four-year gap between visits to Dr. Yingling.[12]  (Id. at 17-19.)  He further noted that Plaintiff had not followed up on the recommended carpal tunnel release surgery and had had carpal tunnel symptoms at least before 2002; her cardiologist had not noted or placed any significant limitations or restrictions on her activities; and the record included no continuing references to sleep apnea.  (Id. at 20.)  He noted that Plaintiff smoked and drank and was continually advised to stop doing both.  (Id. at 20-21.)  He also noted that although Plaintiff routinely informed several of her doctors of her smoking and drinking, with the remarkable exception of Dr. Yingling and the pain clinic physicians, she generally declined any assistance in stopping.  (Id. at 20.)  And, she left her last job because the family was relocating, not because her impairments prevented her from working.  (Id. at 21.)

With her RFC, Plaintiff was able to perform her past relevant work as an administrative assistant as she actually performed it and as it was generally performed.  (Id. at 21.)  She was not, therefore, under a disability within the meaning of the Act.  (Id.)

---

[12]The ALJ also referred to a failure to proceed with the recommended radiofrequency facet ablation treatment.  Plaintiff did, however, undergo such treatment.  There are no records reflecting the effectiveness, or ineffectiveness, of such.

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments

listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This

evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that (1) the ALJ erred by not reopening the August 2005 decision and (2) the ALJ's decision is not supported by substantial evidence on the record as a whole because he (a) did not consider the combined effect of her impairments, (b) improperly evaluated her credibility, and (c) did not emphasize her numerous diagnoses.

Reopening the Prior Decision.  As noted by the Eighth Circuit Court of Appeals, 42 U.S.C. § 405(g) "authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.'" **Efinchuck v. Astrue**, 480 F.3d 846, 848 (8th Cir. 2007) (alteration in original).  "Under § 405(g), courts generally lack jurisdiction to review the Commissioner's refusal to reopen the proceeding[13] because a refusal to reopen the proceeding is not a 'final decision of the Commissioner . . . made after a hearing.'"  **Id.** (quoting § 405(g)) (alteration in original) (footnote added).  "Jurisdiction may exist, however, if the claimant challenges the refusal to reopen the proceeding on constitutional grounds."  **Id.** Accord **King v. Chater**, 90 F.3d 323, 325 (8th Cir. 1996).  No such challenge is made in the instant case.  Rather, Plaintiff argues that the evidence shows she never improved after July 2004.  Her challenge to the Commissioner's determination that she was not disabled after that date has already been pursued under § 405(g) and may not again be reviewed by this Court. See **Lepper v. Barnhart**, 25 Fed. Appx. 433, 435-36 (7th Cir. 2001) (rejecting argument that

---

[13]The *Commissioner* may reopen a decision for any reason within twelve months of the notice of the *initial* determination or for good cause within four years of the notice.  20 C.F.R. § 404.988(a), (b).  Good cause is defined as when new and material evidence is furnished, when a clerical error is made when calculating benefits, or when the evidence on which the challenged determination was made shows on its face that a error was made.  20 C.F.R. § 404.989(a).  Id.  The Commissioner may also reopen for one of eleven fact-specific reasons set forth in 20 C.F.R. § 404.988(c), none of which apply in the instant case.

district court erred in finding that it lacked jurisdiction to review SSA's refusal to reopen claimant's application when claimant had not raised constitutional claim).

Substantial Evidence.  In challenging the scope of the evidence supporting the ALJ's decision on her claim of disability after August 2005, Plaintiff argues that he did not consider the combined effect of her multiple impairments.

When, as in the instant case, a claimant asserts multiple impairments, the Commissioner must "consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling." **Cunningham v. Apfel**, 222 F.3d 496, 501 (8th Cir. 2000) (citing 20 C.F.R. § 404.1523).  This requirement applies to both physical and mental impairments.[14] **Id.**  Accord **Delrosa v. Sullivan**, 922 F.2d 480, 484 (8th Cir. 1991).  Where, as here, the ALJ discusses and considers each of a claimant's impairments, her complaints of pain, and her daily activities, and then concludes that her impairments are not, singly *or in combination*, disabling, there is no error.  See **Browning v. Sullivan**, 958 F.2d 817, 821 (8th Cir. 1992)

---

[14]The ALJ did not find that Plaintiff had a mental impairment.  Although this is not challenged by Plaintiff, the Court notes that the ALJ's conclusion is supported by the evidence. Specifically, although Plaintiff sometimes complained to health care providers of depression, she never sought treatment for such and consistently failed to pursue the treatment that was recommended, e.g., counseling.  Moreover, her complaints of stress were linked to situation, e.g., trouble with her daughter or son.  Thus, were Plaintiff to argue that the ALJ erred by not finding her depression to be a severe impairment, her argument would be unavailing.  See **Page v. Astrue**, 484 F.3d 1040, 1043-44 (8th Cir. 2007) (affirming ALJ's finding at step two that depression was not severe when claimant had not received any mental treatment); **Cox v. Barnhart**, 471 F.3d 902, 906, 908 (8th Cir. 2006) (affirming denial of benefits when claimant had presented no evidence that she had been treated by mental health professional); **Holland v. Apfel**, 153 F.3d 620, 622 (8th Cir. 1998) (affirming finding that depression was not severe when claimant had been prescribed antidepressant after mother's death, but had no ongoing treatment).

(holding that, in such circumstances, "[t]o require a more elaborate articulation of the ALJ's thought processes would not be reasonable") (internal quotations omitted).

Plaintiff next argues that the ALJ improperly assessed her credible complaints of pain. The ALJ found those complaints not to be entirely credible given (a) their inconsistency with the objective medical evidence, (b) the lack of any limitations or restrictions placed on her by her doctors, (c) her failure to follow recommended courses of treatment, (d) her leaving work for a reason unrelated to her impairments, and (e) the disconnect between her alleged disability onset date and her impairments. These criteria are, as discussed below, proper reasons for discrediting complaints of disabling pain.

When evaluating a claimant's subjective complaints, an ALJ may properly consider whether those complaints are supported by the objective medical evidence, although a lack of such support may not be the only reason for discounting her complaints. **Halverson v. Astrue**, 600 F.3d 922, 931-32 (8th Cir. 2010). Plaintiff complained of disabling heart problems and of pain in her neck, lower back, left knee, wrists, and hips. During the relevant time period, she complained to her cardiologist in April 2005 of occasional chest tightness, shortness of breath, and back problems. Ten months later, she again described her chest pain as occasional and was only taking nitroglycerin sporadically. The pain was described by her cardiologist as atypical and probably due to stress Plaintiff was under because of trouble with her daughter. Her first complaint of neck pain appears in the July 2006 records and is described as having lasted for four days and being attributable to an increased use of the computer. The next time she sought medical attention for related impairments was in

February 2007 and then it was simply to discuss her condition. There were no new concerns or problems. Two months later, she told her cardiologist that she had not needed to use nitroglycerin for "quite some time." Her primary complaint was her weight. In May 2007 and again in September 2007, she complained of back pain. She sought treatment from the doctor who had previously treated her for such pain in February 2008, four years after last seeing him. The following month, she consulted another doctor fo her pain in her left knee, hips, and back. After receiving an injection in her knee and, from another source, in her hips, she cancelled her next appointment with him and did not return until three months later, at which time she had a nonantalgic gait and a good range of motion in her left knee. The next month, the doctor gave her another injection and approved her application for a *temporary* disabled license for a period no longer than six months.

When Plaintiff did see her doctors, none placed any functional restrictions or limitations on her. This also is a proper consideration when evaluating a claimant's credibility. See **Sammons v. Astrue**, 497 F.3d 813, 820-21 (8th Cir. 2007); **Hensley v. Barnhart**, 352 F.3d 353, 357 (8th Cir. 2003). See also **Young v. Apfel**, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.").

Also detracting from Plaintiff's credibility is her repeated failure to stop smoking, stop drinking, and lose weight – all courses of action consistently recommended by her treating

physicians.[15]  "A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."  **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005).  See **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010) (claimant's noncompliance with her doctor's instructions to take her medications, follow her diet, and totally abstain from drugs and alcohol was a valid consideration supporting adverse credibility determination); **Mouser v. Astrue**, 545 F.3d 634, 638 (8th Cir. 2008) (failure of claimant with shortness of breath problems to stop smoking is a failure to follow a prescribed course of treatment and was properly considered when assessing his credibility); **Lewis v. Barnhart**, 353 F.3d 642, 647 (8th Cir. 2003) (ALJ properly considered failure of claimant alleging disability due to asthma and joint pain to stop smoking cigarettes daily and to start exercising as her doctors recommended).  She also failed to seek counseling, as recommended.

Further detracting from Plaintiff's credibility was her departure from her job as an administrative assistant because her family was relocating after her husband's retirement, not because of her cited impairments.  See **Medhaug v. Astrue**, 578 F.3d 805, 816 (8th Cir. 2009); **Ford v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Goff v. Barnhart**, 421 F.3d 785, 793 (8th Cir. 2005).  And, her alleged date of onset was unrelated to any precipitating and

---

[15]Plaintiff argues in her brief that she had *been* a smoker and *occasionally* drank beer and that her drinking and smoking were mentioned only two times in record.  (Pl.'s Br. at 6.)  This argument misrepresents the record.  Plaintiff continually smoked and drank.  Indeed, at the hearing, she testified that she drank thirty to thirty-five beers each week and smoked one pack of cigarettes a day.  There are at least six references by at least four different health care providers in her medical records to her drinking and smoking and to recommendations that she stop.

aggravating factors.  See **Wildman**, 596 F.3d at 968 (considering such factors as relevant to a claimant's credibility).

"Where adequately explained and supported, credibility findings are for the ALJ to make." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000).  The ALJ having explicitly discredited Plaintiff's testimony and having "give[n] good reasons for doing so," see **Jones v. Astrue**, 619 F.3d 963, 975 (8th Cir. 2010) (internal quotations omitted), the Court will defer to that determination.

Plaintiff further argues that the ALJ erred by not emphasizing her numerous impairments and her testimony about the pain in her back and hands.  As noted above, however, the ALJ found several of her impairments to be severe and properly considered whether those impairments, singly or in combination, precluded her from performing her past relevant work as it is performed in the economy and was performed by her.  His weighing of her testimony is, as discussed above, supported by substantial evidence on the record as a whole.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal

quotations omitted); accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED

and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  28th  day of March, 2011.